STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket Nos. AP-07-41,
AP-07-51, AP-08-10

MICHAEL ADAMS, et al.,

Plaintiffs,

v.

TOWN OF BRUNSWICK,

and

DIMITRI SERETAKIS, et al,

Defendants,

DIMITRI SERETAKIS, et al.,

Plaintiffs,

v.

TOWN OF BRUNSWICK,

Defendant.

ORDER

Before the court are three Rule 80B appeals concerning 17 Cleaveland Street in Brunswick. Seventeen Cleaveland Street is located within the TR2 District in Brunswick and is owned by Dimitri and Anthony Seretakis. Seventeen Cleaveland is also located within the Village Review Zone established by the Brunswick Zoning Ordinance.

The first appeal (AP-07-41) is brought by Michael Adams, Ernest Bevilaqua, Warren Dwyer, and Patricia Welsch (collectively, the "Abutters") from a May 30, 2007 decision of the Brunswick Zoning Board of Appeals (ZBA) affirming a ruling of the Brunswick Planning Director that 17 Cleaveland, as it is proposed to be used by the

Seretakises, meets the definition of a dwelling rather than a boarding house. Dwellings are permitted within the TR2 District, but boarding houses are not. *See* R. Tab 62 at 418.

The second and third appeals are brought by the Seretakises with respect to certain alterations they made to install dormers at 17 Cleaveland Street. In AP-07-51 the Seretakises appeal from a preliminary ruling of the Brunswick Village Review Board (VRB) that an appeal taken by the Abutters to the VRB with respect to the construction of the dormers was timely. In AP-08-10 the Seretakises appeal from the VRB's decision that two of the seven dormers installed by the Seretakises were not appropriate within the Village Review Zone.

All these appeals involve a somewhat convoluted procedural history.

1.    Procedural History

In early April 2007 the Seretakises applied pursuant to the Brunswick zoning ordinance for Certificate of Appropriateness for the addition of seven new dormers at 17 Cleaveland (five for the main house and two for the barn). Under the Brunswick zoning code a certificate of appropriateness is required, *inter alia*, for any alterations to the exterior structure of a building within the Village Review Zone. *See* Ordinance § 216.4 (R. Tab 62 at 488). Ordinarily applications for certificates of appropriateness are made to the Village Review Board with notice to abutting landowners. *See* Ordinance § 216.8 (R. Tab 62 at 490). However, the ordinance also provides that where the impact of proposed alterations will be minor in the judgment of the planning director, the planning director may grant certificates of appropriateness. Ordinance § 216.4(B)(1) (R. Tab 62 at 488). In such instances the ordinance makes no provision for notification to abutters.

2

In this case the Seretakises' application for a certificate of appropriateness was approved by staff of the Brunswick Planning Department on or about April 9, 2007. (R. Tab 1 at 1). Nothing in the documents submitted for the certificate of appropriateness disclosed anything as to how many people would be living in 17 Cleaveland Street or the circumstances of their occupancy. *See* R. Tab 1. No notice had been sent to abutters. *See* R. Tab 35 at 195.

A certificate of appropriateness is a prerequisite to the issuance of a building permit to perform the actual alteration work, and on April 17, 2007, a building permit was issued to the Seretakises by the Town. (R. Tab 3 at 34). The Seretakises' application for a building permit mentioned only the construction of dormers. (R. Tab 2 at 17-33). Nothing in that application disclosed anything about the number of people who were expected to reside in the building, their status, or the conditions of their occupancy.[1] Moreover, the Brunswick ordinance does not require that notice of a building permit application be given to abutters and there is no evidence that any such notice was given.

In early May the Abutters became aware that the Seretakises intended to rent 17 Cleaveland to eleven Bowdoin students. *See* R. Tab 53 at 264. The record reflects that Adams, Bevilaqua and Dwyer met with Town Planner James Fortune on May 11, 2007 and queried whether such a use would constitute a boarding house not permitted in the TR2 Zone. (R. Tab 6 at 41). Shortly afterward, the code enforcement officer got in touch with the Seretakises and was informed that their position was that they were continuing the existing use of 17 Cleaveland as two dwelling units. *Id.*[2]

---

[1] Although the permit application contained a space for the applicant to provide a "brief description of current and proposed uses," that space was left blank. R. Tab 2 at 17.

[2] As far as the record reflects, this was the first time any town officers looked into this issue.

Further discussions were thereafter held between the Abutters and town officials. The Town acknowledges that the Abutters were first informed that a building permit had been issued for the dormers on May 23, 2007, more than a month previously. *See* Town's Rule 80B Brief dated August 8, 2008 at 3; R. Tab 12 at 83-85.

On May 30, 2007 the Town's Director of Planning and Development, acting on behalf of the code enforcement officer (who was temporarily incapacitated), issued a written opinion on the proposed use of 17 Cleaveland by the Seretakises (R. Tab 8 at 65). That opinion stated the Town's understanding that the prior use of the property had been a two-unit residence with a family residing in one unit and two students residing in the other unit. The Seretakises had submitted two rental leases that contemplated 6 students in one unit and 5 in the other. The opinion set forth the code enforcement officer's determination that the proposed use still fell in the two-unit residential use category and did not constitute a boarding house. *Id.*

That same day Adams, Bevilaqua, Dwyer, and Welsch filed an appeal to the Brunswick ZBA. (R. Tab 9 at 61-70). That appeal contested the CEO's May 30, 2007 ruling that the Seretakises' proposed use of 17 Cleaveland did not constitute a boarding house and also sought to challenge the prior issuance of the building permit on April 17, 2007. *See* R. Tab 8 at 62. On May 30, 2007 Adams, Bevilaqua, Dwyer, and Welsch also filed an appeal to the Village Review Board from the issuance of the certificate of appropriateness for the seven dormers. R. Tab 7 at 58-60.

2.    Proceedings on appeal to the ZBA and VRB

The Abutters' appeal to the VRB was heard first, on June 19, 2007. At that time the VRB determined that the Abutters' appeal from the grant of a certificate of appropriateness was timely because, although the Brunswick zoning ordinance

4

specified a 30 day appeal period for building permits, it did not set forth any time limits for appeals from the issuance of a certificate of appropriateness (R. Tab 17 at 107). Aware that there was also an appeal pending to the ZBA on the boarding house issue, the VRB then voted to table the dormer appeal to its next meeting. (R. Tab 17 at 112). Disagreeing with the VRB's decision that the dormer appeal was timely, the Seretakises appealed that decision to the ZBA and then to this court (docket No. AP-07-51).

On June 21, 2007 the Abutters' appeal to the ZBA was heard. At that time the ZBA understood that there were two aspects to the Abutters' appeal. To the extent that the Abutters were appealing from the issuance of the building permit, the ZBA voted 5-0 that the appeal was untimely because it had not been filed within 30 days. (R. Tab 20 at 129, Tab 21 at 130). The ZBA, however, went on to separately consider the Abutters' appeal from the CEO's determination that the proposed use would not constitute a boarding house. R. Tab 20 at 129. On that issue it voted 3-2 to uphold the decision of the CEO on the merits. The Abutters then appealed that decision to this court. (Docket No. AP-07-41).

After the ZBA's ruling, the VRB reached the merits of the Abutters' appeal from the certificate of appropriateness at its July 17, 2007 meeting. At that time the VRB approved the certificate of appropriateness with respect to the five dormers installed in the house, but denied the certificate of appropriateness with respect to the two dormers installed in the barn. R. Tab 27 at 169. The Seretakises appealed that decision to the ZBA, which remanded the matter back to the VRB on September 20, 2007. (R. Tab 35 at 197). On remand the VRB reaffirmed its decision. (R. Tab 43 at 222). The ZBA affirmed that decision on February 14, 2008 (R. Tab 48 at 233), and the Seretakises then appealed the decision that a certificate of appropriateness had wrongly been issued as to two of their dormers to this court (Docket No. AP-08-10).

5

The record reflects that, after expiration of the 30-day appeal period from the issuance of the building permit, the Seretakises had commenced construction of the dormers. The Seretakises have argued that the dormer construction was fully or largely completed by the time the Abutters filed their appeals on May 30, 2007. (R. Tab 31 at 186). However, the Abutters placed the Seretakises on notice as soon as they learned of the building permit that they were contesting the Seretakises' proposed use (R. Tab 5 at 39-40), and have complained that the Seretakises pressed ahead with construction in order to present the Town with a *fait accompli*. *See* R. Tab 11 at 76.

3. Standard of Review

As an initial matter, the Brunswick zoning ordinance provides that the ZBA's role in reviewing actions by the code enforcement officer is appellate in nature. Ordinance §§ 703.1(A), 703.4(C), R. Tab 62 at 581, 586. With respect to the use appeal (the boarding house v. dwelling unit issue), the operative decision is the May 30, 2007 memorandum setting for the code enforcement officer's determination that the use proposed by the Seretakises is not a boarding house. *See Mills v. Town of Eliot*, 2008 ME 134 ¶¶ 14-16, 955 A.2d 258, 263-64.

In contrast, with respect to the certificate of appropriateness for the construction of the dormers, the operative decision is the decision of the Village Review Board. *See* Ordinance § 216.4(B), R. Tab 52 at 488. Although the issuance of such a certificate can be delegated to the Director of Planning where the impact will be minor, *id.*, nothing in the ordinance suggests that once an appeal is taken to the VRB, the VRB is limited to an appellate role.

In both cases, the court is guided by the principles (1) that interpretation of a local ordinance is a question of law that is subject to *de novo* review, *Isis Development*

*LLC v. Town of Wells*, 2003 ME 149 ¶ 3, 836 A.2d 1285, 1287, and (2) that factual determinations made by a municipal official or board will only be overturned if they are not adequately supported by evidence in the record. *Jordan v. City of Ellsworth*, 2003 ME 82 ¶ 8, 828 A.2d 768, 771.

4.      The Boarding House Appeal – Timeliness

Both counsel for the Seretakises and counsel for the Town contend that, having failed to appeal the issuance of the building permit within 30 days, the Abutters' appeal on the boarding house issue is untimely.[3]  The court disagrees.  The record demonstrates that the boarding house issue was not raised or considered when the building permit was granted but was first raised on May 11, 2007 and was first investigated by the Town after that date. (R. Tab 6 at 47). By May 30, 2007, the Town had investigated the issue to its satisfaction, had reviewed the leases, and issued a ruling on the boarding house issue. (R. Tab 8 at 65).  This was the first time there had been a ruling on the issue, and the Abutters took a timely appeal from that ruling to the ZBA as permitted by the Brunswick Zoning Ordinance §§ 703.1(A) (ZBA jurisdiction to hear appeals as to alleged errors in any decision or determination by the CEO), 703.4.

This is especially true since the Brunswick ordinance does not require that notice of building permits be given to abutters.  This is not unusual, *see Viles v. Town of Embden*, 2006 ME 107 ¶ 12, 905 A.2d 298, 302, but it highlights the potential unfairness

---

[3] The position of counsel for the Town is somewhat curious in that, while the Town ZBA found the Abutters' appeal untimely as to the building permit, it agreed with the Abutters that their appeal on the use issue was separate and considered that issue on the merits. *See* R. Tab 20 at 128-29 (separate votes on permit and on use issues); R. Tab 21 at 130 (5-0 vote on appeal as to "permit"); R. Tab 21 at 131 (3-2 vote as to "use").  Ordinarily counsel for a town defends the rulings made by the municipal officers.

of the arguments that appeal deadlines should run from the issuance of a building permit.[4]

5.    Boarding House Appeal – Use

Two contentions have been raised by the Abutters with respect to the merits in AP-07-41. The first is that the proposed use is a boarding house rather than a two-unit residence. The second is that the applicable zoning only allows one unit given the lot size so even if 17 Cleaveland constitutes a two unit dwelling, it would be nonconforming.

The issue of whether the proposed use constitutes a two unit dwelling or a boarding house primarily presents an issue of law. The interpretation of a zoning ordinance is an issue of law. Moreover, the decisions of code enforcement officers, municipal officials, and municipal boards of appeals with respect to the interpretation of ordinances are not entitled to deference. *E.g., Isis Development LLC*, 2003 ME 149 ¶ 3 n. 4, 836 A.2d at 1287 n. 4. In interpreting an ordinance, a court must consider both the objectives sought to be obtained and the general structure of the ordinance as a whole. *Priestly v. Town of Hermon*, 2003 ME 9 ¶ 7 814 A.2d 995, 997.

In this case the relevant provisions of the ordinance are the definitions of dwelling unit and boarding house. "Dwelling unit" is defined as

> A group of rooms providing living quarters containing independent cooking, sleeping, and bathroom facilities for one household.

---

[4] This problem also given rise to a judicially created "good cause" exception. *See Viles*, 2006 ME 107 ¶¶ 8-9, 905 A.2d at 301. To the extent that it is necessary to reach that issue here, the court finds good cause. Adams, Bevilaqua, and Dwyer did not learn that a building permit had been issued until May 23, 2007, after the deadline for an appeal of the permit had expired. They brought their appeal seven days later, after obtaining a ruling on the use issue. This is sufficient to establish good cause under *Viles* and the cases cited therein. *See id.*, 2006 ME 107 ¶ 18, 905 A.2d at 303.

Ordinance § 111, R. Tab 62 at 403. "Household" in turn is defined as "one person, or a group of two or more persons living together in the same dwelling as a single housekeeping unit." *Id.* R. Tab 62 at 405.

In contrast, "boarding house" is defined as

> A building other than a hotel containing a shared kitchen and/or dining room, with sleeping rooms accommodating no more than two persons per room (excepting minor children) which are offered for rent, with or without meals. Includes a college fraternity or sorority.

*Id.* R. Tab 62 at 400.

The code enforcement officer interpreted a boarding house as involving rental of individual rooms rather than entire premises, with each tenant being responsible for the rent of their rooms only. R. Tab 8 at 65. He also concluded that a group of students sharing the same kitchen and bathroom facilities could constitute a single household unit for purposes of meeting the definition of a dwelling unit. *Id.*[5]

Absent the reference to fraternities and sororities, the court, in reviewing the ordinance *de novo*, would have little difficulty adopting the same interpretation as the code enforcement officer. Boarding houses are commonly understood to provide individual rooms for sleeping that are independently rented to individuals, either with meals provided or with shared kitchen facilities. Under this interpretation, the leases

---

[5] The code enforcement officer thus interpreted the permitted uses in the TR2 District as permitting a single residential structure with two dwelling units, each containing one household. The ZBA majority agreed with this conclusion, noting that the ordinance definitions do not refer to a "family" and could apply to an associated groups of people. R. Tab 21 at 133. In fact, while the definitions do not refer to a "family," the permitted use table in § 202.1 of the ordinance, R. Tab 62 at 418, does refer to "dwelling, single/two family." However, because the ordinance definition of dwelling unit refers to households, not families, the court concludes that there is no requirement that a household constitute a family. A contrary conclusion would open up the very difficult question of what constitutes a family and whether unrelated persons cohabitating together or living as roommates would be excluded from that definition.

provided by the Seretakises appear to involve two communal households rather than a boarding house. R. Tab 61 at 366-81.

The remaining question is whether the inclusion of fraternities and sororities adds a different gloss to the definition of boarding house. Fraternities and sororities are not commonly understood to involve individually rented rooms. However, they still involve "a shared kitchen and/or dining room." *See* R. Tab 62 at 400. Moreover, fraternities and sororities have individual residents rather than residents organized into household units. Accordingly, while the court does not adopt the interpretation of the code enforcement officer, it nevertheless concludes that 17 Cleaveland – which consists of a six-bedroom apartment and a five-bedroom apartment, each with separate kitchen facilities and leased as two units rather than to 11 individuals – constitutes two dwelling units rather than a boarding house.

In reaching this conclusion, the court takes no position as to the desirability or undesirability of student housing in residential neighborhoods but rests its decision on the wording of the ordinance. The Abutters essentially argue that a group of unrelated students cannot constitute a household unit. The problem with this argument is that household units are not limited to family units but may involve families, extended families, unrelated individuals cohabiting together, and friends whose only relationship is that of roommate. Students are not per se excluded from the category of persons who may form household units, and the court is reluctant to adopt a definition of "household unit" that would require code enforcement officers to investigate the nature of the personal relationships that may exist among the residents of a dwelling unit. This does not mean that the Town would be prohibited from amending its ordinance, if it wished to do so, to specifically address the issue of student housing in residential

10

neighborhoods, e.g., by setting a reasonable limit on the number of unrelated college students who may inhabit dwelling units in a given neighborhood.

The remaining question is whether 17 Cleaveland should be categorized as one unit with an accessory apartment or two units. On this issue the court agrees with the determination of the code enforcement officer that 17 Cleaveland constitutes a grandfathered two unit building.[6] The Abutters, noting that two units are not permitted under the existing density requirements (R. Tab 62 at 419), argue that 17 Cleaveland had previously been one unit with an accessory apartment rented to students. They argue that this has changed with the alterations made by the Seretakises and therefore that the existence of two units has not been grandfathered.

The record reflects, however, that the concept of a one unit dwelling with an accessory apartment was not incorporated in the zoning ordinance until 1997. (R. Tab 20 at 125). Before that time a dwelling with an accessory apartment would have constituted a two-unit residence, and there is evidence in the record to support the code enforcement officer's determination that 17 Cleaveland is a two-unit residence that is grandfathered under the density regulations. R. Tab 20 at 125; R. Tab 22 at 140-43.

6.      Dormer Appeal – Timeliness

Remaining to be considered are the appeals taken by the Seretakises with respect to the two dormers as to which a certificate of appropriateness was ultimately denied by the VRB.

---

[6] Contained in the record are plans indicating that on the first floor there may be two connecting doors between the apartments and that the apartments may share a mudroom. R. Tab 22 at 153. The record does not reflect whether the connecting doors ordinarily remain locked or unlocked. There are no connecting doors on the upper floors.

The Brunswick Zoning Ordinance specifies that when the Department of Planning makes a decision with respect to a certificate of appropriateness, appeals for that decision are to be decided by the VRB. Ordinance § 216.8(B), R. Tab 62 at 490. However, no time limit is specified in the ordinance for appeals to the VRB. Because a 60 day time limit ordinarily applies when zoning ordinances are silent with respect to the deadline for an appeal, see Viles v. Town of Embden, 2006 ME 107 ¶ 6, 905 A.2d at 301; Keating v. Zoning Board of Appeals of Saco, 325 A.2d 521, 525 (Me. 1974), the Town concluded that a 60 day limit applied in this case, and that the Abutters' appeal (filed 53 days after the certificate of appropriateness was originally issued) was timely.

The Seretakises raise two major points in support of the contention that the appeal was untimely. First, they argue that the information packet given to applicants for a certificate of appropriateness specifies that appeals from decisions of the Planning Department "must be made within 7 days of the Department's decision." R. Tab 52 at 249. However, the court is not aware of any authority for the proposition that, where no appeal deadline is set by statute or ordinance, a Town can informally set a binding deadline by including it in an informational packet. This is particularly true when an appeal is being taken by parties other than the applicant – parties who would not ordinarily receive the informational packet.

The second argument made by the Seretakises is that, since a certificate of appropriateness is a prerequisite for a building permit, see Ordinance § 216.5 (R. Tab 62 at 489), the applicable appeal period should run from the issuance of the building permit. As a matter of logic, this makes some sense. However, under the ordinance, the issuance of a certificate of appropriateness is separate from the issuance of a building permit. The former is issued by the Planning Department or by the VRB, the latter by the code enforcement officer. Absent any language in the ordinance

12

combining the appeal period with respect to a certificate of appropriateness with the appeal period for a building permit, the court will not combine the two by judicial fiat.

This is particularly true since the Abutters were not required to be given (and were not given) notice of the issuance of the building permit. In contrast, the Brunswick ordinance contemplates that certificates of appropriateness will ordinarily go to the VRB and that notice will be given to neighbors before VRB review. Ordinance § 216.8, R. Tab 62 at 490.

In this connection, it bears emphasis that in setting the 60 day period in *Keating*, the Law Court expressly noted the substantial danger that, with notice not required to be given to abutters, abutters would be deprived of their right to appeal unless a reasonable appeal period were provided. 325 A.2d at 524-25. This supports the application of a 60-day appeal period with respect to the certificate of appropriateness in this case. The Town's decision in AP-07-51 is affirmed.


7.    Dormer Appeal – Merits

The Seretakises argue that the VRB's decision to deny a certificate of appropriateness to the two dormers for the barn should be reversed on the merits. First, they argue that the VRB inappropriately conducted a *de novo* review of the Planning Department's decision without giving any deference to the Planning Department's decision. *See* Appellant's Brief dated July 9, 2008 in AP-08-10 at 5-6. There are three problems with this argument. First, as the Seretakises concede, *see id.* the wording of the ordinance does not specify that the VRB will be limited to a purely appellate role. *See* Ordinance § 216.8(B); *compare* § 703.4(C) (R. Tab 62 at 490, 586). Second, the ordinance expressly contemplates that the VRB, except in minor instances, will be the decision-making body with respect to certificates of appropriateness. *See,*

13

*e.g.,* Ordinance § 216.9, R. Tab 62 at 490-91. Third, with respect to whether the standards in § 216.9 were met, the record before the Planning Department is not adequate to permit judicial review, as opposed to the extensive record developed before the VRB.[7]

The Seretakises' other major argument is that the standards set forth in the Brunswick zoning ordinance for a certificate of appropriateness are too vague to be enforced. The Town argues that the Seretakises did not raise this contention below and are therefore precluded from raising it for the first time on appeal. There is authority to support this contention. *See New England Whitewater Center Inc. v. Department of Inland Fisheries and Wildlife*, 550 A.2d 56, 58, 60-61 (Me. 1988).

Assuming the court is entitled to reach the vagueness issue, several of the criteria in question, *see* Ordinance § 216.9(A)(1)(a)-(e), R. Tab 62 at 490, do raise issues with respect to vagueness. However, the court can uphold the ruling of the VRB if it concludes that at least one of the criteria necessary for a certificate of appropriateness was not unconstitutionally vague and that there is substantial evidence to support the VRB's determination that the two rejected dormers did not meet that criteria.

In this case the court concludes that the requirement in § 216.9(A)(1)(b) – that "any alteration of existing properties shall be compatible with their historic character, as well as with any surrounding properties" – is not unconstitutionally vague. *See, e.g., Rangeley Crossroads Coalition v. LURC*, 2008 ME 115 ¶¶ 12-13, 955 A.2d 223, 227-29; *Lentine v. Town of St. George*, 599 A.2d 76, 79-79 (Me. 1991) (ordinances should be interpreted in a manner that will preserve their constitutionality). In this case there is substantial evidence to support the VRB's decision that the two dormers on the barn

---

[7] Moreover, in the zoning context, review by a municipal board is either purely appellate or *de novo*. There is no authority in zoning cases for the "modified *de novo* review" to which the Seretakises contend they were entitled. Appellants' Brief dated July 9, 2008 in AP-08-10 at 5.

would not be compatible with the historic character of the property. *See* R. Tab 26 at 165, R. Tab 38 at 204-05, 206. In particular, the VRB based its decision on the absence of any evidence that dormers had ever historically been placed on barns. *Id.*

The entry will be:

In AP-07-41, the determination of the code enforcement officer that the proposed use of 17 Cleaveland Street would not constitute a boarding house is affirmed. In AP-07-51 the decision of the Village Review Board that the Abutters' appeal from the issuance of a certificate of appropriateness was timely is affirmed. In AP-08-10 the decision of the Village Review Board denying a certificate of appropriateness to the two dormers placed in the barn roof is affirmed.

The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:    February __13__, 2009

_____
Thomas D. Warren
Justice, Superior Court

15

Date Filed __March 18, 2008__ Docket No. __AP-08-10__

County **CONSOLDATED WITH AP07-41, AP07-51 ALL FURTHER PLEADINGS AND DOCKET ENTRIES TO BE IN AP07-41**

Action __80B APPEAL__

DIMITRI SERETAKIS

ANTHONY SEERTAKIS

INHABITANTS OF THE TOWN OF BRUNSWICK

vs.

Plaintiff's Attorney

SANDRA GUAY
P.O. BOX 468
BIDDEFORD, MAINE 04005-0468
284-4581

Defendant's Attorney

Patrick Scully Esq
PO BOX 9729
Portland ME 04104

---

Date Filed __10-18-07__ __Cumberland__ County Docket No. __AP07-51__

**CONSOLIDATED WITH AP07-41 & AP ALL FURTHER DOCKETING AND FILINGS TO BE IN AP07-41**

Action __80B APPEAL__

INHABITANTS OF THE TOWN OF BRUNSWICK

DIMITRI SERETAKIS
ANTHONY SERETAKIS

vs.

Plaintiff's Attorney

Sandra L. Guay Esq
PO BOX 468
Biddeford ME 04005-0468
(207)284-4581

Defendant's Attorney

Patrick J. Scully, Esq.
PO BOX 9729
Portland, ME 04104-5029
(207)774-1200

---

Date Filed __08-06-07__ __CUMBERLAND__ County Docket No. __AP-07-41__

**CONSOLIDATED WITH AP07-51 & AP08-10 ALL FURTHER DOCKETING AND FILINGS TO BE IN AP07-41**

Action __80B APPEAL__

MICHAEL ADAMS
ERNEST BEVILACQUA
WARREN DWYER
PATRICIA WELSCH

INHABITANTS OF THE TOWN OF BRUNSWICK
DIMITRI SERETAKIS
ANTHONY SERETAKIS

vs.

Plaintiff's Attorney
RICHARD L HORNBECK ESQ
PO BOX 636
BRUNSWICK ME 04011
(207)729-0856

Defendant's Attorney
GEOFFREY H. HOLE, ESQ./JOAN FORTIN ESQ.
P.O. BOX 9729 (Inh of Town of Bruns
PORTLAND, MAINE 04104-5029
774-1200

Sandra L. Guay, Esq.(Dimitri Sere-
P.O. BOX 468 Anthony Seretakis takis